*In re* MARRIAGE OF JUDITH KAPLAN, Petitioner-Appellant, and CHARLES KAPLAN, Respondent-Appellee.

First District (3rd Division)   No. 84—1554

Opinion filed February 19, 1986.

Schiller, Du Canto & Fleck, Ltd., of Chicago (David B. Yavitz and Sarane C. Siewerth, of counsel), for appellant.

Rosenfeld, Rotenberg, Schwartzman, Hafron & Shapiro, of Chicago, for appellee.

JUSTICE WHITE delivered the opinion of the court:

Petitioner Judith Kaplan appeals from the division of property and awards of child support, maintenance and attorney fees ordered by the trial court in its supplemental judgment of dissolution of marriage. We reverse and remand.

Charles and Judith Kaplan were married August 15, 1965. Their daughter, Lori, was born in 1967, and their son, Daniel, was born in 1969. During the course of the marriage Judith assumed the duties of a homemaker and mother, while Charles invested most of his effort in establishing his business concerns. Judith also worked part-time in various jobs.

Judith and Charles purchased a home in Lincolnwood, and they accumulated substantial collections of coins, stamps, clocks and other items. They invested in publicly traded stock and real estate. Charles also owns 49% of the stock in Cotovsky-Kaplan Physical Therapy Associates (Edgewater), 66% of the stock in C.F.R. Corporation, and 50% of the stock in K&B Financial Services. All three companies are closely held. Judith owns Judy Kaplan & Associates, a venture which she started after the marriage was dissolved.

The trial court dissolved the marriage on August 30, 1982, in the first part of a bifurcated proceeding, pursuant to section 401(3) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 401(3)). By the time the second part of the proceedings began, the parties agreed that Judith was to retain custody of Lori, and Charles was to retain custody of Daniel. Charles was paying Judith $1,000 per month in unallocated temporary maintenance and child support pursuant to court order. Following extensive hearings, the trial court entered a supplemental judgment awarding Judith the marital home and its furnishings, one-half of a $20,000 debenture, some stock, her nonmarital business and miscellaneous personal property. The court awarded Charles his three businesses (Edgewater, C.F.R. and K&B), all of the real estate except the marital home, one-half of a $20,000 debenture, some stock, his IRA account and his share in profit-sharing plans, and miscellaneous personal property. The court valued the property it awarded Charles at $335,000; it valued the property it awarded Judith at $236,000. The court awarded Judith $450 per month in child support, but awarded her no maintenance. The court ordered Charles to pay $9,000 of Judith's attorney fees, which totaled $30,502.90. The court did not order Charles to pay any of the fees Judith owed the accountant who worked for Judith on the case. His fees were $18,710.

The trial court explained that it gave Charles a disproportionate share of the assets because he had incurred personal liability of $300,000 for C.F.R., and the court expected that Charles would have to repay that debt from the other assets the court awarded him. Judith contends that the trial court decision to evaluate C.F.R. as a net liability of $300,000 was contrary to the manifest weight of the evi-

dence. Since the trial court substantially based its division of the property and its other awards upon its evaluation of C.F.R., we turn first to this portion of the judgment.

C.F.R. is a finance company which makes high-risk loans to small businesses. The loans are generally secured by first or second mortgages on real estate. Judith introduced into evidence an audit dated September 14, 1982, prepared by Charles' accountant, Louis Brookstone, reflecting C.F.R.'s financial position as of May 31, 1982. According to the audit, C.F.R. had total assets of $897,000, consisting of $907,000 in outstanding loans less $141,000 in allowances for bad debts, and $131,000 in other assets. C.F.R. had total liabilities of $704,000, leaving a total shareholder's equity of $193,000. Thus, the audit showed that Charles' 66% interest in C.F.R. was worth approximately $127,000 at the end of May 1982.

Judith also presented the testimony of an accountant, Jerome Lipman; he concluded that C.F.R. was worth $437,000, so Charles' interest was worth approximately $288,000. The discrepancy between the Brookstone audit and Lipman's evaluation was due to Lipman's reduction of the bad debt allowance from $141,000 to $16,000, and his inclusion of goodwill valued at more than $100,000.

Charles responded to Judith's evidence regarding the value of C.F.R. with his own testimony and the testimony of Brookstone and Allen Boyer, the attorney for C.F.R. Brookstone testified that C.F.R. had no value. On cross-examination he explained that he had discovered a $200,000 shrinkage in the company in the five months between the time he prepared the audit and the time of trial. He did not explain how the outstanding loans lost so much value so quickly. If Brookstone's testimony were believed, it might support a finding that C.F.R. had a net worth between 0 and minus $10,000. However, it cannot support the trial court's determination that C.F.R. had a net value of negative $300,000.

Boyer testified concerning the status of 16 specific loans made by C.F.R., out of its total of 21 loans. Boyer testified that the 16 loans, totaling approximately $660,000, were technically in default. He testified that he expected three of the loans, totaling $88,000, to be paid in full despite the technical defaults. He testified that payments were currently being made on another $45,000 loan, and a $93,000 loan was mostly recoverable. He further testified that the amount of recovery was "questionable" on another nine secured loans worth a total of $330,000, and he indicated that he expected C.F.R. to recover nothing from two loans which total $99,000.

Thus, Boyer's testimony supports the conclusion that C.F.R. may

suffer bad debt losses between $99,000 and $429,000 ($99,000 + $330,000). If the security on all of C.F.R.'s "questionable" debts proved to be completely worthless, and C.F.R. suffered bad debt losses of $429,000, its net worth would be negative $95,000 ($907,000 - $429,000 + $131,000 = $609,000 in net assets, against $704,000 in liabilities.) Furthermore, we note that all of C.F.R.'s loans were secured, and therefore C.F.R. may eventually receive substantial value in return for loans that are currently in default. Therefore, Boyer's testimony cannot support the trial court's conclusion that Charles was likely to be personally liable for $300,000 for C.F.R.'s debts.

■ Charles testified that C.F.R.'s liabilities exceeded its assets by $300,000. This opinion regarding C.F.R.'s net value was not supported by specific testimony regarding individual loans made by C.F.R., evaluation of the security for these loans, the testimony of Charles' own witnesses, or any documentation. Charles did not explain C.F.R.'s precipitous decline from a net value of nearly $200,000 in May 1982, to a net value of negative $300,000 in February 1983. The trial court's decision to accept Charles' unsupported testimony is contrary to the manifest weight of the evidence. The court's distribution of property, based upon its evaluation of C.F.R., constitutes an abuse of discretion, and therefore the case must be remanded for a redetermination of the value of C.F.R. and an appropriate redistribution of property.

■ Judith maintains that the court should have applied to C.F.R. the formula for determination of bad debt reserves set out in *Black Motor Co. v. Commissioner* (1940), 41 B.T.A. 300, 302. Under the *Black Motor* formula, the Internal Revenue Service allows businesses to deduct as uncollectable a percentage of their receivables equal to the percentage of receivables actually written off as uncollectable for the prior five years. In the five years ending 1981, C.F.R. wrote off an average of about 1.8% of its accounts receivable each year. Judith contends that C.F.R.'s bad debt allowance must be limited to 1.8% of its receivables of $907,000, or approximately $16,000, instead of the $141,000 shown in the audit, and instead of the $600,000 bad debt allowance which the trial court approved.

The United States Supreme Court approved the Internal Revenue Service's application of the *Black Motor* formula in *Thor Power Tool Co. v. Commissioner of Internal Revenue* (1979), 439 U.S. 522, 58 L. Ed. 2d 785, 99 S. Ct. 773. However, the court stated: "Of course, there will be cases *** in which the formula will generate an arbitrary result. *** In such a case, where the taxpayer can point to conditions that will cause future debt collections to be less likely than in the past, the taxpayer is entitled to *** an addition larger than *Black*

*Motor* would call for." (439 U.S. 522, 549, 58 L. Ed. 2d 785, 806, 99 S. Ct. 773, 789-90.) In the instant case there is clear competent testimony that debts, totaling more than the $16,000 allowed under the *Black Motor* formula, are unlikely to be collected. The trial court appropriately found that it was not bound to the rigid application of the *Black Motor* formula.

Judith next contends that the trial court erred in its valuation of Edgewater. The court found that Charles' 49% interest in Edgewater was worth $90,000. Brookstone testified that he evaluated Edgewater in February or March of 1981 in order to prepare a stock offering to Edgewater employees. He testified that the value of the stock was then about $18 per share, for a total of $180,000. He further testified that in his opinion the value of Edgewater had not changed much since his evaluation in early 1981, despite the company's subsequent financial statements showing a net profit of $51,000 for all of 1981, against a net loss of $35,000 for 1980. Richard Peelo, a financial adviser to health care providers, also testified for Charles regarding Edgewater, but he gave no opinion regarding Edgewater's overall prospective earnings, Charles' salary from Edgewater, or Edgewater's overall value.

Judith submitted into evidence Edgewater's income tax return for 1981, Charles' personal financial statements for 1978 through 1981, and Louis Cotovsky's personal financial statement for 1981. According to Cotovsky's statement, dated January 30, 1981, Edgewater had a total value around $376,000. Charles placed a similar value on the company in his statement dated October 1980. In his latest financial statement, dated October 1981, Charles stated that Edgewater was worth more than $283,000. According to Edgewater's 1981 tax return, the company had $201,000 in retained earnings and total shareholders' equity of $209,000.

Judith also presented Lipman's testimony regarding Edgewater's value. He concluded that the company was worth $725,000. On cross-examination Lipman admitted that during his deposition he stated that an accountant with his firm had previously presented a tentative evaluation of Edgewater, in which Edgewater was found to be worth approximately $180,000. Lipman explained that at the time of the deposition he had not yet received statements showing Edgewater's income for 1981, and he had not personally reviewed the evaluation his associate made. Edgewater's book value increased by more than $50,000 due to the increase in retained earnings in 1981, and Lipman added another $100,000 in estimated receivables. The remainder of the increase was based upon a reevaluation of Edgewater's goodwill.

After reviewing all of the above evidence, the trial court found that Edgewater was worth $180,000, and Charles' share was worth $90,000.

■■■ This court has stated that "precise rules for determining the value of closely held stock cannot be laid down \*\*\*." (*In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 248, 430 N.E.2d 716.) The trial court's evaluation and distribution of marital property will not be disturbed absent an abuse of discretion. (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 318, 453 N.E.2d 866.) However, Illinois courts have found that book value, or shareholders' equity, is an appropriate figure to use as a starting point for determining the value of a closely held corporation (*In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 509, 436 N.E.2d 228), although it is not conclusive. (*In re Marriage of Reib* (1983), 114 Ill. App. 3d 993, 1000, 449 N.E.2d 919.) The goodwill of the corporation should also be taken into account (*In re Marriage of Fleege* (1979), 91 Wash. 2d 324, 327-28, 588 P.2d 1136, 1138-39; Rev. Rul. 59-60, 1959—1 C.B. 237, 238), along with the economic outlook for the industry in question (Rev. Rul. 59-60, 1959—1 C.B. 237).

■■ We find nothing in the record which reconciles the trial court's finding that Edgewater was worth $180,000 with the evidence that the shareholders' equity was in excess of $200,000, nor was there any evidence that Edgewater had negative goodwill. There was no evidence which indicated that Edgewater's assets were improperly valued in its income tax return, nor was there any evidence that Edgewater was likely to become unprofitable in the near future. The trial court erred in evaluating the company at less than its shareholders' equity in these circumstances.

Upon remand the trial court should evaluate the goodwill of Edgewater and add that amount to its book value, and it should take into account prospects for the industry as a whole. Lipman found that Edgewater had goodwill worth more than $400,000. The documents he submitted in support of his valuation show that he considered the salaries paid to Charles and Cotovsky to be company profits for purposes of evaluating the company's goodwill. There is ample evidence in the record that both Charles and Cotovsky devoted considerable time and energy to performing services necessary for the company, and if they had not performed these services it appears that they would have needed to pay substantial sums to other employees to do the work. There is no indication in the record that Edgewater overpaid Charles and Cotovsky for their work. On remand the trial court should specify its grounds for its evaluation of Edgewater's goodwill

and its prospects for future earnings.

■ Our reversal of the trial court's evaluation of two of the principal properties at issue in this case requires a reexamination of property distribution, child support, maintenance and attorney fees. (*In re Marriage of Brown* (1982), 110 Ill. App. 3d 782, 788, 443 N.E.2d 11.) Judith has advanced several further grounds for reversal; since we find that the cause must be remanded for retrial on all issues, we do not address these arguments.

Reversed and remanded.

RIZZI, P.J., and McNAMARA, J., concur.