*In re* MARRIAGE OF DOROTHY BRENNER, Petitioner and Counter-respondent-Appellee, and DONALD BRENNER, Respondent and Counter-petitioner-Appellant.

First District (6th Division) No. 1—91—0170

Opinion filed September 25, 1992.

Beermann, Swerdlove, Woloshin, Barezky, Becker, Genin & London, of Chicago (Howard A. London, of counsel), for appellant.

Mary Ellen Dienes, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Donald and Dorothy Brenner were divorced on August 31, 1990. Among other distributions, the court awarded Dorothy the family home and $1,200 per month in permanent maintenance. Donald was awarded his 50% share in the stock of his company, Brenik, Inc. (Brenik), and the land on which the company is located. The court also ordered Donald to pay Dorothy $30,000 annually for 10 years for a total of $300,000, which constituted her 50% share in the company and land.

Donald poses three questions on appeal: (1) whether the court's reliance on Dorothy's expert witness' valuation of the company stock was erroneous and reliance on it was an abuse of discretion, resulting in an inequitable property division; (2) whether the court committed reversible error in relying on Dorothy's one-year-old valuation of Donald's real estate at 925 W. Chicago Avenue in Chicago; and (3) whether the award of attorney and expert witness fees should be vacated and reconsidered on remand.

The parties were married in 1969 and had one child, Marcia, who was an adult at the time the marriage was dissolved. Dorothy filed for dissolution of marriage in 1986 and Donald filed a counterpetition in 1989. On August 31, 1990, after a contested trial, the judge awarded Dorothy the couple's home in Evanston and $1,200 per month in permanent maintenance. The judge awarded Donald the couple's 50% interest in Donald's business, Brenik, and their 50% in-

terest in the real estate at 925 W. Chicago Avenue, where Brenik is located. The court ordered Donald to pay Dorothy $300,000, payable in 10 annual installments of $30,000, which amounted to her half of the value of the business and real estate. The court also ordered Donald to pay Dorothy's attorney and expert witness fees.

Donald disputes the valuation of the business and the real estate, which he contends resulted in the erroneous award of $300,000 to Dorothy. We find valuable a review of the expert testimony regarding both the valuation on Brenik and the valuation of the Chicago Avenue real estate.

Paul H. Wieland, a certified public accountant, testified as an expert witness on the valuation of the company for Dorothy. He explained that there are several methods available to value a company, and that he followed the American Institute of Certified Public Accountants' "formula method" to determine the value of Brenik after deciding that it was the best method to use.

Applying the formula method, Wieland reviewed the company's previous five years of sales, expenses, cost of sales, earnings before income taxes and officers' compensation. Wieland testified that this information permitted him to determine the company's earnings before income taxes and officers' compensation. He testified that he compared that figure with industry standards to determine whether the company had any goodwill value. By adding in the net tangible assets of the company, Wieland testified that he was able to come up with a total value of the company.

Wieland's valuation of Brenik, as of October 31, 1987, was $717,000 with $504,000 in tangible assets and $213,000 in intangible assets or goodwill. Wieland explained that he calculated the value of the goodwill by adding the compensation paid to the owners with the company's earnings before income taxes were paid.

Between the time Wieland finished his appraisal, October 1987, and the time of trial, July 1990, he had been given an opportunity to review financial statements for the six months ending April 30, 1990, and the year ending October 31, 1989. The documents indicated to him that the company "is viable and its operations had been improving since 1990." More recent company documents also showed corporate debt of $230,000, $150,000 of which was notes payable to corporate officers and $80,000 payable on bank loans.

Wieland valued the total assets of the corporation at $408,000 as of 1990 with $230,000 in liabilities. When asked his opinion on the current value of Brenik, Wieland responded: "I have not done a full updated valuation. So, I would be hesitant to give a formal conclusion.

But based on my preliminary calculations using those financial statements, I would say it would be in excess of $400,000."

He speculated, however, that the $150,000 liability to the owners/shareholders should be classified as shareholder equity instead of company liability. He testified that if the company was sold, the owner/shareholders would realize the profit from having notes "payable to themselves." Therefore he added the $150,000 to the $400,000 figure he gave earlier and came up with a value "along the lines of $580,000 at April 30, [1990,] just using very preliminary calculations."

On cross-examination, Wieland admitted that he never sought out an explanation for the $150,000 loan from the officers to the corporation and did not know if the officers' loans were based on their personal signatures on bank loans for the corporation. Wieland valued the tangible assets at $322,455 primarily by taking half of the value quoted to him by the company's insurance agent as the replacement cost on the equipment. He admitted that the figures were not necessarily a true market value for used equipment. He acknowledged that Donald's expert had, item by item, valued the equipment at $101,600 and admitted that he made no list of the actual equipment on site. Wieland acknowledged that ordinarily he would use a separate appraiser for the equipment and machinery. He admitted that he had never valued a woodworking establishment or any other company with woodworking machinery.

Edmund J. Apcel, a lawyer and certified public accountant working as a business evaluator and tax preparer, testified as an expert witness for Donald. He used factors enumerated in the Internal Revenue Service Ruling 59—60 (Rev. Rul. 59—60, 1954—1 C.B. 237) to place a value on the business as of July 31, 1988, and also prepared an updated valuation as of October 31, 1989.

He testified that Revenue Ruling 59—60 dictates that an evaluator consider national economy and industry economy among other factors. Apcel hired M.J. Weiss of Green Machinery Co., a woodworking equipment manufacturer, to value the fixed assets of the company. As of 1988, the value of the fixed assets totalled $101,690. He derived his value in the company by starting with the balance sheet, eliminating the book value of the assets appraised by Weiss, substituting Weiss' values, adding in the value of the office equipment, two company cars and the roof-mounted cyclone and duct system. Apcel valued the company at $202,632.50 as of July 31, 1988. He updated the valuation as of October 31, 1988, considering losses the company had incurred, and valued the company at $114,000. The company lived "hand-to-mouth" and had outstanding loans of $150,000 from the officers. After re-

viewing the April 1990 statistics and financial statement for the business, Apcel valued the company at $200,000.

Apcel criticized Edward G. Siegel, Ltd.'s $2.042 million valuation of the company performed at Dorothy's request, stating that the company erroneously included the building in the company's valuation. The building belongs to Donald and co-shareholder Reuben Nickel personally and is therefore not a corporate asset. The Edward G. Siegel valuation is identified as a "preliminary valuation of Brenik, Inc., as of October 31, 1987."

Apcel also criticized Wieland's valuation of the machinery and equipment, contending that he should have used replacement costs to determine the values instead of obtaining an appraiser's opinion on the market value. It also was error for Wieland to add back into company earnings the officers' compensation. The Internal Revenue Service had discredited valuing a company by adding back in officers' compensation and considered that method of valuing a company to be a method of last resort. The officers had a right to draw a salary as working employees of the company. On cross-examination, Apcel admitted that he had only valued one other company as an independent appraiser before valuing Brenik.

Donald testified that he owned a 50% share in Brenik. He described the company's history, purchase of equipment, loans and move into the Chicago Avenue office. He and Reuben Nickels each personally owned a 50% share of the Chicago Avenue property and building.

Reuben Nickels, the other shareholder of Brenik, testified that he would sell his share of the company to Donald for $50,000 based on a buy-sell agreement the two had signed. He gave extensive testimony regarding the operations of the business from its inception in 1977, explaining what the company does and how money flowed into and out of corporate accounts. He and Donald signed a buy-sell agreement around the time the company was incorporated, and the agreement has never been amended.

James Gervasio, a certified public accountant, testified about his previous work with Brenik and the company's financial stability. His work on the company's financial statement, ending April 30, 1990, resulted in a valuation of the stockholder's equity at $42,016.

William Farina testified as an expert real estate appraiser for Dorothy. He valued the Chicago Avenue property at $590,000 one year before the trial. When asked whether he had an opinion as to the value of the real estate at the time of trial, Farina responded: "No, I do not have an opinion. I would need to investigate what's happened

in the market since then." He added, however, that he thought $590,000 was still a reasonable estimate for the value of the building.

On cross-examination, Farina admitted that six months before he valued the land at $590,000, he and another person from his office had valued the land at $555,000. He attributed the increase to additional comparable sales in the area.

Donald introduced through evidence deposition the testimony of Aron Kahn of Richard F. Roos & Associates, Inc. Kahn valued the property at $395,000 as of January 1989, five months before Farina's appraisal.

After hearing all the testimony, the trial judge denied Donald's counterpetition for dissolution and granted Dorothy's petition for dissolution on the grounds of mental cruelty. The court found Dorothy's expert real estate witness to be more credible because he presented more comparable sales located near the Chicago Avenue building. He valued the property at $590,000, finding Donald's interest in the property was $295,000.

With regard to Brenik, the court found incredible Apcel's testimony and, "[t]herefore, I am using the wife's valuation of $550,000 for Brenik, Incorporated." The court found Donald's interest in the company was $275,000.

The judge ordered Donald to pay Dorothy $30,000 per year for 10 years beginning on January 1, 1991. The court explained that this $300,000 in payments to Dorothy would serve to create a 60% to 40% split of marital assets. The judge made other distributions of marital assets and ordered Donald to pay Dorothy's attorney fees and expert witness fee. Donald appeals from the portion of the order requiring him to pay the fees and requiring him to pay $300,000 to Dorothy based on the valuation of Brenik and the Chicago Avenue property.

Our primary concern on appeal is the trial court's reliance on Dorothy's expert witness to value Brenik at $550,000, and the distribution of assets resulting therefrom. Having reviewed the evidence, we reverse and remand this cause to the trial court for a redetermination as to the value of the corporation.

■ No precise rule exists for valuing closely held corporations; however, book value is an appropriate starting point to determine the value, and goodwill of the corporation should also be taken into account along with the economic outlook for the industry in question. *In re Marriage of Kaplan* (1986), 141 Ill. App. 3d 142, 148, 490 N.E.2d 69.

Though the distribution of marital assets is within the sound discretion of the trial judge and will not be disturbed on appeal unless

there has been a clear abuse of discretion (*In re Marriage of Bush* (1991), 209 Ill. App. 3d 671, 677, 567 N.E.2d 1078), a reviewing court must reverse if it determines that the trial court acted arbitrarily and without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial injustice resulted. *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 180, 478 N.E.2d 1068.

■ In reviewing the testimony of Dorothy's expert, we find troublesome several statements made by and calculations relied on by Wieland to determine the value of Brenik. Most disturbing is the expert's own admission on direct examination that his valuation of Brenik was a "preliminary valuation." Marital assets should be valued as of the date of dissolution. (*In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 38, 495 N.E.2d 659.) Wieland admitted that his valuation on the date of dissolution, July 1990, was based upon a preliminary valuation of the company in October 1987. Also, he admitted that he could not give a "formal conclusion" as to the value of the company. Also, he admitted that he never took into account a $50,000 debt the corporation incurred in June 1990.

Wieland admitted that he never obtained a competent appraisal of the company's equipment and machinery, estimated to be 52% of the company's worth, but instead relied on three-year-old insurance replacement costs to value the equipment at $284,500.

Wieland did not testify that this was a "commonly used practice" (*In re Marriage of Hazard* (1988), 167 Ill. App. 3d 61, 67, 520 N.E.2d 1121) (trial court properly excluded doctor's testimony when it was based on evidence considered unreliable according to the standards of his profession)) and, in fact, stated that when preparing a final report he would normally hire an appraiser to determine the market value of the equipment.

We also find error in Wieland's decision to include the two working owners' salaries as corporate assets. Revenue Ruling 68—609 specifically states that where the business is a sole proprietorship or a partnership, a reasonable amount for services should be deducted from the earnings for those engaged in the business. Rev. Rul. 68—609, 1968—2 C.B. 327. See *Lloyd B. Sanderson Estate v. Commissioner* (2d Cir. 1930), 42 F.2d 160 (which held that the same rule should apply to working owners of a corporation).

Because we remand this cause for a proper valuation on the corporation, we will address other errors alleged by Donald on appeal.

■ Donald contends that his witnesses, including himself, provided adequate testimony to establish the existence of a buy-sell agreement between Donald and Nickels that would pay each of the parties $100,000 if the other bought him out. Testimony established that the agreement was signed around the time of the company's incorporation in 1977 and had not been modified prior to the time of trial. We find it significant that Donald never introduced the agreement into evidence, never cross-examined Wieland on the alleged agreement, and that the agreement was more than 10 years old yet allegedly placed a current value on the owners' shares. We find no abuse of discretion in the insignificance the court placed on the alleged agreement.

■ Donald argues that a market value of the corporation should not have included goodwill because such an item was unique to him and would not be sold with the company. His argument, however, goes to the value or lack of value in the company's goodwill, not to whether goodwill should be included. Goodwill is a recognized tangible asset of a corporation (*Board of Trade v. Dow Jones & Co.* (1982), 108 Ill. App. 3d 681, 693 n.2, 439 N.E.2d 526) and should be considered when valuing a closely held corporation for the division of marital assets. *In re Marriage of Kaplan*, 141 Ill. App. 3d at 148.

At the same time, the trial court should not "double count" the goodwill, considering it both as a corporate asset and then as future income used to calculate maintenance payments. Here, the trial judge ordered Donald to pay $14,400 per year in maintenance and $30,000 per year as a cash offset for his value of the company.

The supreme court considered the value of goodwill and its effect on marital assets in *In re Marriage of Zells* (1991), 143 Ill. 2d 251, 572 N.E.2d 944. Similar to the circumstances in the present case, the trial court purported to divide the marital assets but offset an award of real assets for the wife against the professional goodwill which was assigned to the husband by virtue of the goodwill found in the value of his professional corporation, a law firm. *In re Marriage of Zells*, 143 Ill. 2d at 254.

The supreme court held that a trial judge should consider goodwill either when valuing the corporation itself or in determining the spouse's income-generating ability. To figure goodwill in both facets of the practice would be to double count and reach an erroneous valuation. The court held that when goodwill is reflected in the income potential of a party and the party's ability to pay maintenance, any additional consideration of goodwill is duplicative and improper. *In re Marriage of Zells*, 143 Ill. 2d at 256.

■ Although we remand this case for a redetermination on the value of the company, we uphold the trial court's valuation of the real estate at 925 W. Chicago Avenue.

Donald contends that William Farina's appraisal of $590,000 for the property was outdated because it was performed a year before the trial and was based on comparable sales up to two years earlier than the trial. Farina testified that he could not provide a trial date valuation of the property unless he had a chance to investigate more recent sales in the area.

Donald therefore argues that the trial court is required to value marital assets as of the date of dissolution, and the failure to do so is reversible error. *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 495 N.E.2d 659.

We find that Donald waived this issue by not contesting Farina's outdated appraisal at trial and by not providing the court with his own more recent valuation on the property. The parties to a dissolution must provide the trial court with sufficient evidence of property value. (*In re Marriage of Wolf* (1989), 180 Ill. App. 3d 998, 1006, 536 N.E.2d 792.) A reviewing court will not reverse and remand where the parties had adequate opportunity to present evidence but failed to do so. *In re Marriage of Gluszek* (1988), 168 Ill. App. 3d 987, 993, 523 N.E.2d 126.

Because the court had two independent valuations on the property and Donald chose not to provide the court with a more updated valuation, we find the court's decision justified and find no abuse of discretion by the trial court in valuing the real estate.

■ Finally we consider whether the award of attorney and expert fees should be vacated and reconsidered on remand. If an abuse of discretion is found, the proper remedy is to reverse the property settlement in the judgment and remand the case for a reevaluation of the assets and redivision of the all marital assets. *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 495 N.E.2d 659.

Donald contends that, if any property division is reversed based on improper valuations, then the court also must reconsider its order that Donald pay Dorothy's attorney fees and expert fee. (*In re Marriage of Kaplan* (1986), 141 Ill. App. 3d 142, 490 N.E.2d 69.) Though *Kaplan* also dealt not only with maintenance but also child support, we agree with Donald's premise that a reexamination of marital assets could impact the parties' abilities with regard to maintenance, attorney fees and expert witnesses, and therefore should also be considered on remand.

In conclusion, we affirm the trial court's valuation on the Chicago Avenue real estate. We reverse and remand this cause for a proper determination of the value of the corporation, the resulting distribution of marital assets and the payment of attorney and expert witness fees.

Affirmed in part; reversed in part and remanded.

EGAN,* P.J., and RAKOWSKI, J., concur.

---

*Justice Rosemary LaPorta participated in oral argument before her death. Presiding Justice Edward J. Egan was substituted on the panel. He has listened to the oral argument tape and has read the briefs.