Nos. 2—09—0591 & 2—09—1160 cons.
Opinion filed January 12, 2011

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| CECILY B. SCHINELLI, | ) | of Du Page County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | No. 05—D—915 |
| and | ) | |
| | ) | |
| BRUCE G. SCHINELLI, | ) | Honorable |
| | ) | Linda E. Davenport, |
|     Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Burke concurred in the judgment and opinion.

**OPINION**

This is the second appeal before this court regarding the dissolution of the parties' marriage. On March 16, 2007, the circuit court of Du Page County entered an order dissolving the 25-year marriage of the parties, Bruce and Cecily Schinelli. The trial court divided the marital estate evenly, factoring in against Bruce's share a charge for dissipation in the amount of $26,273. The trial court ordered permanent maintenance to Cecily in the amount of $6,692 per month. Additionally, the trial court ordered additional maintenance to Cecily in the amount of one-third of Bruce's annual gross income between $200,000 and $650,000 (supplemental maintenance). Bruce appealed from that order. In the first appeal, Bruce argued that the trial court erred in (1) setting the amount of

permanent maintenance; (2) ordering supplemental maintenance; and (3) finding that he dissipated $26,273 in marital assets. This court affirmed the trial court's order of permanent maintenance but reversed the trial court's order capping the supplemental maintenance range at $650,000 and instead capped it at $250,000. As to dissipation, this court affirmed a finding of dissipation of $2,625; we reversed a finding of $5,729; and we remanded for a new hearing to determine whether Bruce dissipated the remaining $17,919 withdrawn from the parties' joint tax-exempt money-market account. *In re Marriage of Schinelli*, No. 2—07—0617 (2008) (unpublished order under Supreme Court Rule 23) (*Schinelli I*).

On remand, the trial court entered three orders from which Bruce now appeals. Bruce contends that the trial court erred in (1) awarding Cecily $15,000 in attorney fees for defending the first appeal; (2) finding that he had dissipated $17,919 of marital assets; and (3) entering a "Qualified Domestic Relations Order" (QDRO) that improperly modified the judgment of the dissolution of marriage. For the following reasons, we reverse and remand for additional proceedings.

The record in this case is substantial. A great deal of evidence was presented in the trial court. Therefore, only those facts necessary to an understanding of this court's decision will be set forth below, and the relevant facts will be discussed in the analysis of the issues to which they are pertinent.

Award of Attorney Fees

On August 21, 2008, Cecily filed a petition for contribution of fees and costs incurred in the previous appeal. Cecily sought reimbursement for attorney fees of $30,570.07 and costs of $272.81. The petition was supported by an affidavit from Cecily's attorney regarding his firm's fees. The petition was not supported by any affidavit from Cecily. On December 11, 2008, following a hearing, the trial court ordered Bruce to pay $15,000 of Cecily's attorney fees. The trial court explained that

if Bruce had appealed only the issue of supplemental maintenance, he would have prevailed and no contribution to fees would be warranted. However, since Bruce had also appealed the award of permanent maintenance and dissipation, the trial court held that contribution was appropriate.

On appeal, Bruce argues that the trial court's decision to award Cecily $15,000 in attorney fees was against the manifest weight of the evidence. Bruce contends that Cecily failed to show that she had an inability to pay her own fees. Bruce further argues that the trial court erred in determining that Cecily was entitled to a portion of her fees because she substantially prevailed on the first appeal.

At the outset, we consider Cecily's argument that we do not have jurisdiction over Bruce's first contention. Cecily notes that when the trial court entered its order awarding her attorney fees, the trial court indicated that its order was final. Cecily contends that, because the trial court's order was final, Bruce should have filed his appeal within 30 days rather than waiting for the trial court to resolve the other postjudgment petitions that had been filed in the case. As Bruce did not, Cecily argues that we may not consider the propriety of the award of attorney fees. In so arguing, Cecily acknowledges that her contention is inconsistent with this court's decisions in *In re Marriage of Alyassir*, 335 Ill. App. 3d 998 (2003), and *In re Marriage of Duggan*, 376 Ill. App. 3d 725 (2007). However, she urges this court to overrule *Alyassir* and to instead adopt the analysis set forth in the special concurrence in *Duggan*.

In *In re Marriage of Gutman*, 232 Ill. 2d 145, 151 (2008), our supreme court recently explained:

> " 'An order is final and appealable if it terminates the litigation between the parties on the merits or disposes of the rights of the parties, either on the entire controversy or a separate part thereof.' *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 159

(1998). Absent a Rule 304(a) finding, a final order disposing of fewer than all of the claims is not an appealable order and does not become appealable until all of the claims have been resolved. *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 464 (1990). This court has defined a 'claim' as 'any right, liability or matter raised in an action.' *Marsh*, 138 Ill. 2d at 465. The rule was meant 'to discourage piecemeal appeals in the absence of a just reason and to remove the uncertainty which existed when a final judgment was entered on fewer than all of the matters in controversy.' *Marsh*, 138 Ill. 2d at 465."

Here, the trial court's order awarding Cecily attorney fees did not include a finding pursuant to Supreme Court Rule 304(a) (eff. Jan 1, 2006). Thus, pursuant to *Gutman*, the trial court's order was not appealable until all of the other claims had been resolved. As Bruce properly filed his notice of appeal after the trial court had resolved all of the claims pending between the parties, this court has jurisdiction over the issue of the award of attorney fees. See *Gutman*, 232 Ill. 2d at 151. In so ruling, we note that our supreme court's decision is consistent with our decisions in *Alyassir* and *Duggan*. We therefore decline Cecily's invitation to revisit either of those cases.

Turning to the merits of Bruce's first contention, we note that attorney fees are generally the responsibility of the party who incurred the fees. *In re Marriage of Cantrell*, 314 Ill. App. 3d 623, 630 (2000). Section 508(a) of the Illinois Marriage and Dissolution of Marriage Act (the Dissolution Act) (750 ILCS 5/508(a) (West 2008)) provides in part:

"The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees." 750 ILCS 5/508(a) (West 2008).

The propriety of an award of attorney fees is dependent upon a showing by the party seeking them of an inability to pay and the ability of the other spouse to do so. *Cantrell*, 314 Ill. App. 3d at 630. Although awarding fees rests largely in the trial court's discretion, such an award will be reversed when the financial circumstances of both parties are substantially similar and the party seeking fees has not shown an inability to pay. *In re Marriage of Roth*, 99 Ill. App. 3d 679, 686 (1981).

Here, the trial court abused its discretion in ordering Bruce to pay $15,000 of Cecily's attorney fees. The record reveals that Bruce earned substantially more than Cecily. He earned approximately $200,000 a year while Cecily earned approximately $30,000 a year. However, in dissolving the parties' marriage, the trial court attempted to rectify this difference, ordering that Bruce pay Cecily permanent monthly maintenance of $6,692 ($80,304 a year). Thus, considering the combination of Cecily's annual salary and her maintenance award ($30,000 + $80,000 = $110,000) in conjunction with Bruce's salary and his maintenance obligations ($200,000 - $80,000 = $120,000), the parties' financial circumstances were substantially similar. Based on this fact, and because Cecily did not demonstrate that she was unable to pay her attorney fees, the trial court erred in ordering Bruce to pay those fees. See *id.*

In so ruling, we find Cecily's reliance on *In re Marriage of Minear*, 181 Ill. 2d 552, 561 (1998), to be misplaced. In that case, the wife had monthly net income of $1,086 and also received monthly maintenance of $500 (for a total of $1,586 a month). The husband's monthly net income, after making the maintenance payment, was $2,563. At a hearing on her motion to have the husband pay her attorney fees, the wife testified that she could not pay her legal fees and that she could not afford to continue paying $675 in monthly mortgage payments. The trial court subsequently awarded the wife her attorney fees. In this case, Cecily's maintenance award was substantially higher than the

wife's in *Minear*. Moreover, unlike the wife in *Minear*, Cecily did not provide evidence that she could not afford to pay her own legal fees.

Further, Cecily acknowledges that her trial counsel pointed out at the hearing that "substantially prevailed" was not a question before the court. Indeed, section 508(a) of the Dissolution Act makes no reference to attorney fees being awarded to the party who substantially prevailed in previous litigation. See 750 ILCS 5/508(a) (West 2008).

### Dissipation

At the trial on March 1, 2007, Cecily's attorney questioned Bruce about withdrawals he had made from the parties' joint USAA tax-exempt money-market account. Bruce testified that he routinely transferred funds from the account to their joint checking account to pay marital bills. As to certain withdrawals, he testified that he did not know why he withdrew the money and did not have any documents to refresh his recollection. The trial court did not allow Bruce's attorney to question Bruce regarding those withdrawals. At the close of the trial, the trial court found that Bruce had dissipated assets. On appeal, this court reversed a finding of dissipation as to $17,919 and remanded for a new hearing so that Bruce could have the opportunity to present evidence that the expenditures made from the joint money-market account between February 2006 and February 2007 were for marital purposes. We also stated:

> "In so ruling, we note that although Bruce was not able to testify as to the withdrawals during his case-in-chief, there was evidence to rebut a determination that Bruce dissipated any funds. The evidence showed that while the dissolution proceedings were pending and the parties were living apart, Bruce paid household expenses for the marital residence, his own household expenses, and all [of the parties' son] Ian's personal and

educated-related [*sic*] expenses. Bruce's [comprehensive financial statement] showed that his monthly income after deductions was $8,652 and that his total monthly expenses were $10,163. Accordingly, Bruce was operating at a monthly deficit of $1,511. Accordingly, withdrawing funds from the joint money market fund in the amount of $17,919 ($26,273 minus the funds spent on [Bruce's girlfriend] Gallo and the funds to pay off the joint credit card) over the course of twelve months seems reasonable. A $1,511 monthly deficit over a twelve-month period results in a total deficit of $18,132, which is approximately the amount withdrawn by Bruce. Bruce testified that the parties' bills were traditionally paid out of the parties' joint checking account. He further testified that he routinely transferred funds from the joint money market account to the checking account when the parties' expenses exceeded the balance in the checking account." *Schinelli I*, slip op. at 21-22.

On April 27, 2009, on remand, the trial court conducted a hearing. Bruce testified that he had withdrawn a total of $17,919 from the parties' joint USAA tax-exempt money-market account and then deposited that money in the parties' joint USAA checking account. These withdrawals and deposits were made on nine occasions. Bruce presented documents that reflected the first eight of the withdrawals and subsequent deposits. He did not have any document that reflected the last withdrawal, of $2,000 on February 9, 2007. However, he testified that he deposited that money into the joint checking account to prevent that account, which had a balance of $799.72 on February 13, 2007, from being overdrawn. (The judgment of dissolution found that the checking account had a value of $2,270 on March 1, 2007.) Bruce also testified that he deposited over $6,000 from one of his personal accounts into the joint checking account.

As to withdrawals from the checking account, Bruce introduced into evidence the checking account statements. These statements detailed every deposit and every ATM, check, transfer, or debit-card withdrawal after the deposits from the money-market account were made. Bruce testified regarding the withdrawals. Bruce testified that from January 2006 through March 2007, he was primarily responsible for paying household expenses for the former marital residence in Naperville. The expenses were paid using electronic transfers from either his personal USAA checking account or the joint USAA checking account. He paid Cecily's housing expenses with the joint USAA checking account. Between January 2006 and March 2007, in addition to Cecily's household expenses, he paid the expenses of establishing his own residence, his general living expenses (gas, food, and clothes), and his son Ian's personal and college expenses. In 2006 and early 2007, Ian's college expenses, for Belmont University in Tennessee, cost about $2,700 a month.

During the time frame at issue, Bruce's monthly gross earnings were $16,717. His monthly expenses for both household's and Ian's schooling were over $10,000. The parties had a joint USAA credit card which both of them used in 2006. He paid the credit card bill in full each month through one of the two accounts. He and Cecily each had a debit card for the joint USAA checking account, which he used occasionally in 2006 through early 2007. Most of the debit transactions were hers. Bruce testified that this was apparent because most of the transactions occurred close to where Cecily lived in Naperville. He lived in Wheeling. Bruce testified that he transferred funds occasionally from the joint USAA tax-exempt money-market account into the joint USAA checking account to cover living expenses over and above their incomes.

Cecily testified that from January 2006 through March 2007 she lived at the former marital residence. She worked at Oak Consulting in Lisle and her pay was directly deposited twice a month

into the joint USAA checking account. Her monthly net income from her employment was $1,048. Her mortgage, utility, food, and other household expenses totaled $3,330 and were paid by Bruce. He paid the real estate taxes from the joint checking account. She paid the monthly cable and cell phone bills from the joint checking account. Her personal expenses of $711 per month and clothing expenses were charged to the parties' joint USAA credit card. The joint USAA credit card bill was paid from their joint checking account. Her monthly miscellaneous expenses totaled $804 and were also paid from the joint checking account.

Cecily acknowledged that she traveled to Florida in January 2006, Tennessee in November 2006, and Las Vegas in December 2006. None of the trips were work-related. She used the joint credit card while she was on those trips. She also acknowledged that she had used the joint checking account to make payments to her attorneys. (The record reveals that Cecily used the joint credit card to pay her attorneys $5,079.51 between January 2006 and February 2007.) She further acknowledged that she made ATM withdrawals from the joint checking account. (The record indicates that she made withdrawals of $1,409.95.)

At the close of the hearing, the trial court ruled that Bruce had failed to show by clear and convincing evidence that he had not dissipated marital assets from the joint checking account. The trial court explained:

"The Appellate Court did specifically say, Counsel, that you were supposed to prove by clear and convincing evidence how the money went. I don't have any canceled checks showing what he paid, I don't have anything. I looked—I can clearly see that he made—he put money into the account. That's clear. I understand how much he was putting into the account.

But he was retaining the rest of the money that he earned. You offered not one piece of evidence today that showed what bills he paid with the remainder of his money: No lease, no rent, no expenses, no car, no gas, no dental bills, nothing that you offered into evidence today.

I do think that clearly he did transfer money into the account. I saw that. When his income went up to the $200,000, it didn't appear that his deposits into this account went up.

I have to look at the amount of money that he was retaining over and above what he was putting in before, he kept it at the same amount, and then he didn't account for how he spent the rest of the money.

I don't think you met the burden that the Court required of you to meet. I thought it was really clear, and I expected to get that evidence in today, and I didn't get one piece of it.

* * *

The remaining seventeen nine one nine, I still find it to be dissipation, I still find that you failed to meet your burden by clear and convincing evidence to show how the funds were spent, not that they weren't deposited, I understand they were deposited."

In *Schinelli I*, this court explained:

"Dissipation has been defined as the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 203 (2005). The determination of whether dissipation occurred in a given case is reviewed using the manifest weight of the evidence standard of review. *Vancura*, 356 Ill. App. 3d at 204. The

-10-

general principle is that the person charged with the dissipation is under an obligation to establish by clear and convincing evidence how the funds were spent. *Vancura*, 356 Ill. App. 3d at 204. General statements that funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation. *In re Marriage of Petrovich*, 154 Ill. App. 3d 881, 886 (1987)." *Schinelli I*, slip op. at 16.

We believe that the trial court erred in finding that Bruce had dissipated assets from the joint checking account. In *Schinelli I*, we remanded for the trial court to conduct a new hearing on whether Bruce had dissipated $17,919 from the joint checking account and to allow him to present evidence on that issue. Although the trial court conducted a hearing and allowed Bruce to present evidence of how funds in the joint checking account had been spent, the trial court's ruling was unrelated to the evidence presented. Instead, the trial court essentially found that Bruce should have been paying the family's bills with one of his individual accounts rather than the joint account. That was improper. See *In re Marriage of Davis*, 215 Ill. App. 3d 763, 778 (1991) (although husband had other funds available to him, he was not required to use those funds, before using marital funds, for family purposes).

As we noted in *Schinelli I*, when Bruce was allegedly dissipating marital assets, he was paying household expenses for the marital residence, his own household expenses, and all of Ian's personal and education-related expenses. These substantial expenses caused Bruce to incur a monthly deficit of $1,511. At the hearing on remand, Bruce testified that the parties' bills were traditionally paid out of the parties' joint checking account. At that same hearing, the parties' statements from the joint checking account were introduced into evidence. Bruce testified in detail regarding the transactions and whether he or Cecily had made each transaction and why it had been made. Bruce further

testified that he deposited over $6,000 from one of his individual accounts into the joint checking account. Based on the evidence adduced at the original trial in conjunction with the evidence presented at the hearing on remand, the record shows that Bruce established by clear and convincing evidence that he did not dissipate marital assets. The trial court's finding to the contrary was therefore against the manifest weight of the evidence.

In so ruling, we reject Cecily's argument that Bruce presented only vague and general testimony as to how the funds were spent. We believe that Bruce's testimony and other evidence sufficiently set forth how the funds from the parties' joint checking account were spent. We also reject Cecily's argument that Bruce essentially admitted that he dissipated $816.50 that he withdrew by ATM and $2,119.99 that he paid to his attorneys. The record reveals that during the time frame at issue, Cecily paid her attorneys fees of $5,079.51. She made ATM withdrawals of $1,409.95. She also used the joint checking account to pay expenses incurred on personal trips to Florida, Tennessee, and Las Vegas. As such, Cecily was making the same types of withdrawals from the joint checking account that she criticizes Bruce for making. Based on these circumstances, we believe that it would be inequitable to find that Bruce dissipated assets and to overlook Cecily's similar conduct.

Qualified Domestic Relations Order

In its judgment of dissolution on March 16, 2007, the trial court evenly divided the parties' retirement assets. The trial court awarded each party his or her own retirement assets. The one exception was Bruce's Wachovia 401(k) account. The trial court divided that asset so that the overall division of the marital retirement assets would be equal. Specifically, the trial court's order provided:

| Asset | Equity | Bruce | Cecily |
|---|---|---|---|

| | | | |
|---|---|---|---|
| TTX Thrift Plan | $5,418 | $5,418 | 0 |
| Wachovia 401(k) | $309,423 | $156,901 | $152,522 |
| Wachovia Deferred Comp. | $62,665 | $62,665 | 0 |
| Schwab IRA | $49,128 | $49,128 | 0 |
| Schwab IRA | $27,732 | 0 | $27,732 |
| Schwab IRA | $27,118 | 0 | $27,118 |
| Oak Consultants 401(k) | $66,670 | 0 | $66,670 |
| Total | $548,224 | $274,112 | $274,112 |

On November 18, 2008, Cecily filed a motion for a QDRO based on the dissolution order. She requested that $152,522 be transferred from the Wachovia 401(k) account to her. Bruce filed a written objection, stating that the value of the plan had dropped drastically due to market conditions. He therefore argued that a transfer to Cecily of the amount originally ordered was no longer appropriate.

On April 27, 2009, the trial court conducted a hearing on Cecily's motion. The evidence established that as of March 31, 2009, the Wachovia 401(k) account had a value of $179,830. In response to comments by the parties as to its intent in dividing the retirement accounts, the trial court explained:

> "I added them all up, divided them by two. She kept hers, he kept his, except for the 401K for him, he would have to roll over money into her. So that, when they all ended up at the bottom, they had the same amount.

* * *

The Wachovia 401K was the vehicle designated to be the one that money would come out of his so that, when it went into hers, they would each have the same total for all of their accounts."

Bruce's attorney argued that Cecily's QDRO should be for half of what the Wachovia 401(k) was currently worth. The trial court questioned whether it could reevaluate one of the parties' retirement accounts without reevaluating all of the other retirement accounts that had been divided. Cecily's attorney argued that the dissolution order provided that she was to receive $152,522 from the Wachovia 401(k); thus, that is the amount she should receive. At the close of the hearing, the trial court ordered that $152,522 (84.8% of the Wachovia 401(k) account's value) be awarded to Cecily.

On appeal, Bruce argues that the trial court erred in entering a QDRO that improperly modified the dissolution order. Bruce contends that the trial court's dissolution order intended that the parties' retirement assets be divided equally between them. However, the effect of the QDRO was to award Cecily an additional $125,000. Bruce insists that the QDRO was improper because it caused him to bear all of the loss that the Wachovia 401(k) account suffered between March 2007 and March 2009. Bruce maintains that, in entering the QDRO, the trial court should have divided the Wachovia 401(k) account loss between them in a way that was consistent with its judgment of dissolution.

Judgments may be construed like other written instruments. *In re Marriage of Breslow*, 306 Ill. App. 3d 41, 57 (1999). For instance, although an unambiguous judgment must be enforced as drafted, an ambiguous judgment may be read in conjunction with the entire record and construed in accordance therewith. *Id*.

Here, the problem with the dissolution order is not that it is ambiguous; the problem is that it is unenforceable. The dissolution order unambiguously provided that Bruce was to receive $156,901 from the Wachovia 401(k) account and that Cecily was to receive $152,522 from the Wachovia 401(k) account. When the trial court entered the QDRO on April 27, 2009, the dissolution order was impossible to comply with because the Wachovia 401(k) account was worth only $179,830. We therefore believe that the trial court's resolution of this issue—to have Bruce bear all the loss that the Wachovia 401(k) account incurred—is both unfair and contrary to the judgment of dissolution. Accordingly, the trial court's decision must be reversed.

In arguing that she should nonetheless receive the full $152,522, despite the diminution in the Wachovia 401(k) account, Cecily relies on *In re Marriage of Carrier*, 332 Ill. App. 3d 654 (2002). We find Cecily's reliance on that case to be misplaced. In *Carrier*, the parties had a marital settlement agreement that provided that the wife would receive $725,000 from the husband's individual retirement account (IRA) via a QDRO. Prior to the entry of the dissolution judgment, the trial court conducted a proveup of the settlement agreement. At the proveup, the husband testified that he understood that the wife was to receive $725,000 from his IRA regardless of whether the market value of the account rose or fell following the entry of the dissolution judgment. On June 14, 2000, the trial court entered a judgment of dissolution that was consistent with the parties' marital settlement agreement. On November 27, 2000, the wife filed a petition for a rule to show cause, alleging that the husband had failed to transfer to her the $725,000. On February 21, 2001, the trial court conducted a hearing on the wife's petition. Several correspondences between the parties were introduced that indicated that, until September 28, 2000, the wife had taken on the responsibility to effectuate the transfer from the IRA. The husband testified that the account was currently worth

$120,000 less than it was when the parties' marriage was dissolved. The husband also testified that he believed the parties were to divide the IRA on a percentage ratio. Thus, because the value of the account had gone down, he asserted that the value of the wife's share had also decreased. At the close of the hearing, the trial court found that for the period between September 1, 2000, and September 28, 2000, each of the parties should assume a proportion of the loss in accordance with his or her ratio of interest. *Id.* at 655-57. On appeal, this court vacated the trial court's decision. *Id.* at 662. We found that the marital settlement agreement unambiguously stated that the wife was to receive $725,000. Because the marital settlement agreement did not indicate that the wife's award from the IRA was to be based on a percentage or to be affected by subsequent fluctuations in market value, we held that the trial court erred in ruling that the wife's share of the IRA was affected by the change in the market value of the account between the dissolution judgment and the date of transfer. *Id.* at 658. In a dissent, one justice wrote the trial court's decision allocating the market losses between the parties should be affirmed. *Id.* at 662 (O'Malley, J., dissenting). The dissent explained that because the wife was responsible for the transfer of the funds during a certain time frame, "it would be patently unfair to saddle [the husband] with the loss incurred during that period of time." *Id.* at 663 (O'Malley, J., dissenting).

Here, unlike in *Carrier*, the parties did not have a marital settlement agreement that divided their marital assets. As such, unlike the husband in *Carrier*, Bruce never agreed that Cecily would receive a fixed amount from the retirement account at issue. Rather, the parties' retirement assets were divided by the trial court. In the absence of any marital settlement agreement providing that Cecily would receive a set amount, we believe that it would be patently unfair to saddle one of the

parties with all of the losses incurred in the Wachovia 401(k) account. Accordingly, as stated above, we believe that the trial court erred in allocating all of that loss to Bruce.

Cecily insists that the trial court's decision may nonetheless be affirmed because Bruce failed to introduce evidence as to whether the value of the other retirement assets had fluctuated. Relying on *In re Marriage of Brenner*, 235 Ill. App. 3d 840, 848 (1992), Cecily contends that the trial court was obligated to reevaluate all of the retirement assets in order to ensure that they were properly divided. Because Bruce did not present the value of the other assets, Cecily argues that he has forfeited his right to any relief.

Generally, if a property division is reversed based on an improper valuation, then the proper remedy is to reverse the property settlement in the judgment and remand the case for reevaluation and redivision of all the marital assets. *In re Marriage of Rubinstein*, 145 Ill. App. 3d 31, 38 (1986). The parties to a dissolution must provide the trial court with sufficient evidence of property value. *Brenner*, 235 Ill. App. 3d at 848. A reviewing court will not reverse and remand where the parties had adequate opportunity to present evidence but failed to do so. *Id.*

Here, we do not believe that the trial court had to reevaluate any of the parties' assets other than the Wachovia 401(k) account. In *Rubinstein*, at issue was the trial court's improper determination of the value of the husband's medical practice. *Rubinstein*, 145 Ill. App. 3d at 38. That determination necessarily impacted the division of the parties' other marital assets as well as the amount of support that the husband should pay the wife. In this case, neither the trial court nor the parties indicated that the division of the Wachovia 401(k) account had any impact on the division of the parties' marital estate other than how the parties' retirement assets were distributed. Indeed, Cecily does not fault Bruce because he failed to present evidence of all of the parties' marital assets;

she faults him only because he did not present evidence of the current value of the parties' retirement assets that had previously been divided.

Based upon how the retirement assets were divided, however, we do not believe that the trial court was obligated to reassess those assets. In its order of dissolution on March 16, 2007, the trial court awarded Cecily a 100% interest in three accounts that had a total value of $121,520. The trial court awarded Bruce a 100% interest in three accounts that had a total value of $117,211. Thus, excluding the Wachovia 401(k) account, the trial court awarded Cecily 50.9% of the retirement accounts and Bruce 49.1% of those accounts. As such, the trial court essentially awarded each party an equal amount of the retirement accounts.

As the parties were awarded these accounts upon the entry of the judgment of dissolution, they were then able to manage the accounts as conservatively or aggressively as they wanted. Thus, the parties were given the ability to minimize their accounts' losses during the stock market decline that occurred in 2008. This was markedly different from the situation with the Wachovia 401(k) account. Because that account was subject to a QDRO, neither party could exercise any discretion over that account until the first appeal was resolved.

We believe that if the trial court were obligated to reconsider the value of the other retirement accounts before it addressed how the Wachovia 401(k) losses should be allocated, it would lead to a potentially unfair result. If the other accounts were considered, the party who managed his or her accounts better during the market decline would have to subsidize the party who incurred more losses with his or her investment strategy in order to ensure that the accounts continued to be divided equally. As this would be improper, contrary to Cecily's assertion, Bruce was under no obligation

to provide the trial court with evidence as to whether the retirement assets previously distributed had fluctuated in value.

Finally, we note that in dividing the Wachovia 401(k) account, the trial court's March 16, 2007, dissolution order had the effect of awarding 50.7% of the Wachovia 401(k) account to Bruce and 49.3% of the account to Cecily. As the trial court's QDRO of April 27, 2009, was not consistent with the order of dissolution, we reverse the QDRO. On remand, the trial court shall enter a QDRO consistent with its dissolution order, awarding 50.7% of the Wachovia 401(k) account to Bruce and 49.3% of the account to Cecily. The value of the Wachovia 401(k) account shall be based on what it would currently be worth had it not been divided on April 27, 2009.

Conclusion

For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed and the cause is remanded for additional proceedings consistent with this decision.

Reversed and remanded with directions.