# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Sobieski*, 2013 IL App (2d) 111146

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF THERESE SOBIESKI, Petitioner-Appellee, and JON W. SOBIESKI, Respondent-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-1146 |
| Filed | January 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of respondent's motion to reconsider the order requiring him to pay $43,180.50 of petitioner's attorney fees and $4,800 each month for child support was affirmed on the grounds that the trial court gave consideration to the statutory factors relevant to the contribution to petitioner's attorney fees and the statutory guidelines were followed with regard to child support. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 08-D-1877; the Hon. James J. Konetski, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Stephen A. Rehfeldt, of Mulherin, Rehfeldt & Varchetto, P.C., of Wheaton, for appellant.

Daniel J. Walker, Jr. and David T. Christensen, both of Cesario & Walker, of Hinsdale, for appellee.

Panel

JUSTICE SPENCE delivered the judgment of the court, with opinion.
Justices Jorgensen and Zenoff concurred in the judgment and opinion.

## OPINION

¶ 1    Respondent, Jon Sobieski, appeals from the judgment of the Du Page County circuit court dissolving his marriage to petitioner, Therese Sobieski, and from the order denying his motion to reconsider. Specifically, Jon contends that the trial court erred in ordering him to pay $43,180.50 of Therese's attorney fees and also erred in setting his monthly child support at $4,800. For the reasons set forth herein, we affirm the judgment of the trial court.

¶ 2                                I. BACKGROUND

¶ 3    Jon and Therese were married on September 4, 1994, in Cook County, Illinois, and during the course of the marriage, the couple had four children. Jon and Therese separated on June 15, 2008, and Therese filed a petition for dissolution of marriage on August 28, 2008. The case proceeded to trial on May 19, 2011, and the relevant portions of the record and the findings of the trial court are set forth herein. The judgment for dissolution of marriage was entered on July 13, 2011. At the time of trial, Jon was 41 years old, Therese was 46, and their four children were 16, 14, 12, and 10.

¶ 4    Jon began working for his father, Vernon Sobieski, at Spirit of America, Inc.,[1] in 1987. Spirit of America, Inc., is a car wash business founded by Vernon. Vernon organized the company so that he and Marilyn Sobieski, his wife and Jon's mother, owned 50% of the company as joint tenants with rights of survivorship, Jon owned 25%, and Robert Sobieski, Jon's brother, owned the final 25%.

¶ 5    Upon Vernon's death in 2005, Marilyn became president of Spirit of America, Inc., and at the time of trial, the only three employees of Spirit of America, Inc., were Marilyn, Jon, and Robert. Jon was employed full-time at Spirit of America, Inc., throughout the entire duration of his marriage to Therese, and he acted as the company's secretary and general manager. In those capacities, he would visit the individual car wash sites, make any

---

[1]There were, at the time of trial, six different Spirit of America corporations. The six corporations will be collectively referred to as "Spirit of America, Inc."

necessary repairs, clean the facilities, and collect the money, whether it be in the form of cash or credit card transactions.

¶ 6 The trial court determined that Jon's net monthly income was approximately $12,000. By the trial court's own admission, determining Jon's monthly net income was difficult. The trial court listed two primary reasons for its difficulty: (1) the trial court found that Jon's testimony lacked credibility, and (2) there was a lack of verifiable information about Jon's income. The trial court found Jon to be "inaccurate if not wholly untruthful about his income." The trial court further found that Spirit of America, Inc., handled significant amounts of cash, which Jon counted. When asked about the amount of cash received by Spirit of America, Inc., Jon responded, "it varies." The trial court noted that Jon's federal tax returns were "internally inconsistent and inconsistent with each other." Finally, the trial court found that Marilyn had provided Jon with "gifts"–*e.g.*, paying for Jon's medical insurance–of at least $50,000 per year for the last five years leading up to trial, which the court found to be additional income to Jon.

¶ 7 Although Jon testified at trial that his gross income from all sources was only $10,000 per month, there was documentary evidence at trial that ran counter to Jon's assertion. On a mortgage refinancing application from 2004, Jon indicated that his income was $13,500 per month, or $162,000 per year. On an application for a home equity line from Chase Bank in 2007, Jon also listed his monthly income as $13,500. Jon claimed at trial that he never made that much money in a given year.

¶ 8 Based on the trial court's determination of Jon's net income at $12,000 per month, the trial court awarded Therese child support in the amount of $4,800 per month. The court arrived at this amount by following the child support guidelines from the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2010)), which set child support for four children at 40% of the supporting party's net income. Jon argued at trial that the amount of child support should be lower, suggesting $4,000 per month, but the trial court did not deviate from the guidelines.

¶ 9 Shortly after Jon and Therese separated, Therese became employed part-time as a sales associate and fitter at Elegance Underneath, a clothing store. She testified that she was working around 20 hours per week at $10 per hour. Therese had been employed full-time at Nordstrom when she and Jon were married, but she quit that job upon the birth of her first child and did not return. She held two different part-time positions during the course of her marriage to Jon. She worked for the Naperville Chamber of Commerce from late 1999 to late 2001 making around $80 per week, and she worked at a law office, in a position that was supposed to function as an externship for her paralegal studies, from October 2006 to January 2007 at $15 per hour. Although she intends to finish her paralegal studies, by the time of trial she had not completed a paralegal studies program.

¶ 10 The trial court found that Therese, with her part-time job that paid $10 per hour at the time of trial, was not self-supporting, and the court was also satisfied with Therese's search for full-time employment. The court found that there was clearly a disparity in incomes as well as a significant disparity in their respective future prospects to earn income.

¶ 11 Also of relevance to the trial court's findings was Therese's health. She has suffered from

physical and emotional illness in the course of the marriage. Therese is bipolar, suffers from depression, and is in remission from non-Hodgkin's lymphoma since June 2007. Therese also testified that she had part of her cervix removed shortly before trial to remove a "secondary cancer." The trial court found that her health insurance cost approximately $685 per month. Based on the aforementioned findings, the trial court ordered that Jon pay Therese $2,500 per month as maintenance.

¶ 12      As to the children, Jon and Therese entered into a joint parenting agreement on April 20, 2011, that was incorporated into the judgment for dissolution of marriage. The parenting agreement provided for joint custody of the children, but the primary physical residence of the children would be with Therese. The parenting agreement provided Jon with extended parenting time during the school year and over holidays. The parties agreed to sell the marital residence, and it was sold for $392,500 on December 1, 2011. Therese received 65% and Jon received 35% of the $62,551.06 net proceeds.

¶ 13      The court divided the rest of the property between Jon and Therese as follows. The court awarded Jon his nonmarital property, which includes: all shares of Integrys that Jon held jointly with his mother; all interest, including stock, that Jon owned in Spirit of America, Inc.[2]; and five motor vehicles held jointly with his mother. The marital assets were divided by awarding a 2008 Ford Expedition to Therese and a 2011 Ford Focus to Jon, awarding the parties their respective bank accounts, awarding Jon three term life insurance policies, dividing Jon's individual retirement account equally between Jon and Therese, and awarding the parties the personal property in their respective possessions.

¶ 14      As for indebtedness of the marital estate, Jon was to pay $6,000 toward Therese's debt of approximately $14,000 as of March 31, 2011. He was also to cover a dentist bill for approximately $1,000 that both he and Therese had listed as indebtedness. Jon's debt totaled approximately $38,000 as of March 31, 2011, with $28,000 of that debt being fees he owed to his attorney.

¶ 15      On May 26, 2011, Therese filed a petition, pursuant to sections 508 and 503(j) (750 ILCS 5/508, 503(j) (West 2010)) of the Marriage Act, for contribution to her attorney fees and costs. She stated that she had incurred $86,361 in attorney fees and that $73,261 remained unpaid. She claimed that she was unable to pay her fees because she was in poor health, lacked assets, and had limited earnings. On the other hand, she contended, Jon earned around $14,000 a month, much more than her approximately $1,000 a month, and he was in better health. Jon also sought contribution to attorney fees in a separate petition. Both Jon and Therese stipulated that the rates and hours of their respective attorneys were reasonable and necessary.

¶ 16      The trial court granted Therese's petition, ordering contribution of $43,180.50, and denied Jon's petition. Both Therese and Jon made motions to reconsider the judgment for

---

[2]Although Edward Pertucci, accountant for Spirit of America, Inc., testified at trial that Jon's 25% share was "unmarketable" because it was a minority share in an S corporation–thus lacking voting power to force money distributions–the trial court found that the shares had value to Jon, given the profitability of the business over time.

dissolution of marriage, which were denied, with the final denial on October 14, 2011.

¶ 17    Jon timely appealed.

## II. ANALYSIS

¶ 19    Jon presents two issues for our review: (1) whether the trial court erred in awarding Therese contribution to attorney fees, and (2) whether the trial court erred in setting the amount of Jon's child support obligation at $4,800 per month. We address each issue in turn, beginning with the issue of attorney fees.

## A. Attorney Fees

¶ 21    Before delving into the propriety of the contribution order, we address Therese's argument that the issue of attorney fees is moot. For the following reasons, we hold that the issue is not moot and that Jon may appeal the order.

## 1. Mootness

¶ 23    Therese argues an agreed order entered on January 23, 2012, incorporated a settlement agreement of the parties, which required Jon to pay a total of $22,500 for Therese's attorney fees. According to the agreed order, the payment was "to settle, resolve and satisfy both the [attorney fees] due under Para. N(i)" of the judgment for dissolution of marriage for attorney fees and the "sum claimed due in the Petition for Rule [to show cause]." Therese quotes the agreed order's provision that the parties reached an "amicable settlement" on the issue of attorney fees. Therese argues that, because the issue was settled and memorialized in the agreed order, Jon's appeal of the contribution order is moot.

¶ 24    Therese's argument is unpersuasive. Examining the January 2012 agreed order in context of the full proceedings shows that the order did not incorporate or memorialize any settlement; it merely ordered the satisfaction of Jon's remaining obligation to pay $43,180.50 of Therese's attorney fees pursuant to paragraph N(i) of the judgment for dissolution of marriage. We set forth the details of the trial court proceedings below.

¶ 25    Jon's contribution to Therese's attorney fees occurred in three parts. First, an agreed order entered on November 30, 2011, provided that 65% of the net proceeds from the sale of the marital residence would go to Therese and 35% to Jon. Of Jon's 35%, $2,500 was to be paid to Jon's attorney, and the remainder was to be paid to Therese in partial satisfaction of the judgment for contribution. The net proceeds from the sale of the marital residence amounted to $62,551.06 ($30,172.67 cash plus $32,378.39 from mortgage release). Jon's share was therefore $21,892.87. Subtracting $2,500 per the November 30 agreed order, $19,392.87 was left for contribution.

¶ 26    Second, on December 5, 2011, the trial court entered an order that required Jon to turn over to Therese the balances Jon had in three bank accounts. The bank account funds totaled $2,445.58 and went toward the satisfaction of the attorney fee judgment.

¶ 27    Third and finally, we come to the January 2012 agreed order. In it, the trial court ordered that Jon pay Therese the sum of $22,500 in satisfaction of money judgments still owing,

including for attorney fees. Adding together all three payments ($22,500 plus $2,445.58 plus $19,392.87) yields a total amount of $44,338.45, which more than satisfies the original obligation of $43,180.50. However, it is unclear from the record whether the full $22,500 was to go toward Therese's attorney fees and how much, if any, was to go toward the sum due under the petition for rule to show cause.[3] Regardless, for the reasons set forth below, Jon does not lose his right to appeal the judgment for attorney fees, whether he paid the original judgment amount in full or in part.

¶ 28　　In Illinois, "it is well established that the payment or satisfaction of a money judgment by a judgment debtor does not bar the prosecution of *** an appeal by such judgment debtor." *Pinkstaff v. Pennsylvania R.R. Co.*, 31 Ill. 2d 518, 523 (1964); see also *Long v. Tranka*, 146 Ill. App. 3d 428, 431 (1986); *Briarcliffe West Townhouse Owners Ass'n v. Wiseman Construction Co.*, 118 Ill. App. 3d 163, 173 (1983) ("The payment of a judgment does not preclude that party from appealing from the judgment."). However, voluntary payment of a judgment waives the right of an appeal. *County of Cook v. Malysa*, 39 Ill. 2d 376, 379 (1968) ("[T]he general rule in civil cases [is] that when a judgment has been voluntarily paid or its benefits accepted the question becomes moot."). Therefore, the salient question here–where Jon has made payments in satisfaction of a judgment against him–is whether payment was compulsory or voluntary.

¶ 29　　We find *Long*, 146 Ill. App. 3d 428, to be instructive. In *Long*, a judgment was entered against the defendant in the amount of $14,227 for repair costs incurred by the plaintiff due to the defendant's failure to comply with a court order. *Id.* at 430. The defendant paid the judgment in full but then appealed whether he should have been required to pay all of the repair costs. *Id.* The plaintiff argued that the appeal was moot because the defendant had voluntarily paid the judgment in full. *Id.* The *Long* court disagreed. *Id.*

¶ 30　　The plaintiff relied on *Malysa* but the *Long* court found such reliance misplaced. *Id.* at 431. *Malysa* was an eminent domain case, and the *Malysa* court held that a condemnor who pays a judgment waives the right to appeal error in the original proceeding. *Malysa*, 39 Ill. 2d at 380-81. The *Malysa* court acknowledged the general rule in Illinois, as set forth in *Pinkstaff*, that an ordinary civil judgment debtor may pay a judgment without waiving the right to appeal. *Id.* at 379. However, the rationale behind the general rule is that "if the

---

[3]In the January 2012 agreed order, the trial court specified that Jon's payment of $22,500 would go toward satisfying the judgment for dissolution of marriage, which ordered the payment of attorney fees, and toward the "sum claimed due in the Petition for Rule [to Show Cause] filed Dec. 5, 2011." The only specific amount sought in the petition for rule to show cause was $2,498.63 as a judgment against Jon. On one hand, if the $22,500 first went toward the $2,498.63, with the remaining amount toward attorney fees, the total amount of attorney fees paid would amount to $41,839.82, which is just short of the original judgment amount of $43,180.50. This would lend a shred of credibility to the argument that the agreed order was a settlement. On the other hand, Therese filed a receipt and satisfaction of judgment on February 1, 2012, acknowledging that the $22,500 paid, along with prior payments, fully satisfied the attorney fees due under paragraph N(i) of the judgment for dissolution of marriage. Regardless, the agreed order is not clear as to whether the $43,180.50 was paid in full or paid just short.

judgment [is] collected by execution the payment would be compulsory *** and the payment after judgment and before execution 'must equally be considered as made under legal compulsion.' " *Id.* (quoting *Pinkstaff*, 31 Ill. 2d at 523).

¶ 31     A judgment in an eminent domain case is an "entirely different situation" than an ordinary civil judgment. *Id.* In an eminent domain case, the judgment does not impose liability on a condemnor; instead, it merely establishes the value that a condemnor must pay if the condemnor wants to acquire title. *Id.* Importantly, the condemnor has no duty to pay, and no execution may issue for the judgment. *Id.* Therefore, the *Malysa* court found that the judgment had been paid voluntarily, and the applicable rule was that, when a civil judgment has been paid or its benefits accepted voluntarily, an appeal of the judgment becomes moot. *Id.* Accordingly, the *Malysa* court affirmed the dismissal of the appeal, because the condemnor's voluntary payment had waived any error in the original proceeding. *Id.* at 381.

¶ 32     *Long* is readily distinguishable from *Malysa*. The payment of the judgment in *Long* was compulsory because the judgment required payment of the repair costs. Had the defendant resisted payment, the plaintiff could have sought execution of the judgment. An act that waives a right to appeal "must be voluntary in the sense that the party is not required by the decree to do the act," and "[p]ayment of a judgment in obedience to a decree does not affect the right to question the decree by writ of error and does not operate as a release of errors *even if there is an agreement that a decree shall be executed as entered*." (Emphasis added.) *Jacksonville Hotel Building Corp. v. Dunlap Hotel Co.*, 350 Ill. 451, 458 (1932).

¶ 33     We find *Long* to be similar to the case at hand. The judgment for dissolution of marriage required, under paragraph N(i), that Jon pay $43,180.50 of Therese's attorney fees. He made two partial payments pursuant to court order: one payment automatically upon the sale of the marital residence and another payment when he was ordered to turn over the funds from three of his bank accounts. That Jon agreed to pay the sum of $22,500 is immaterial; had he not agreed, Therese could have sought an execution of the attorney fee judgment. Therefore Jon paid under compulsion, not voluntarily.

¶ 34     Furthermore, it is immaterial whether the $22,500 combined with the other payments for attorney fees added up to less than the $43,180.50 judgment amount. First, Therese entered a receipt and satisfaction of judgment on February 1, 2012, which states that the $22,500 payment, along with the other payments, fully satisfied the $43,180.50 judgment. Second, even if the payments did not add up to $43,180.50–giving the tenuous guise of a settlement–Jon may still appeal the judgment. Whether Jon paid the judgment in full or at 90 cents on the dollar, the judgment compelled him to contribute to Therese's attorney fees. Furthermore, Jon does not appeal the terms of the January 2012 agreed order, which he could not do on appeal absent showing fraud, coercion, that the order was contrary to public policy, or that the trial court lacked jurisdiction to enter the order. See, *e.g.*, *In re Marriage of Steel*, 195 Ill. App. 3d 348, 352-53 (1990). Rather, he appeals the judgment for dissolution of marriage that preceded and begot the eventual agreed order to pay attorney fees. Therefore, the general rule applies, that satisfaction of a money judgment by a civil judgment debtor does not preclude an appeal of the judgment, and Jon's appeal may proceed.

¶ 35                                2. The Order to Pay Attorney Fees

¶ 36      Jon contends that the trial court abused its discretion in ordering that he contribute $43,180.50 to Therese's attorney fees. Jon argues that: (1) the determination of his net income was too high and (2) even assuming that Jon's net income was properly determined, he and Therese were in substantially similar financial circumstances.

¶ 37      We review a trial court's award of attorney fees under section 508(a) of the Marriage Act (750 ILCS 5/508(a) (West 2010)) for an abuse of discretion. See *In re Marriage of Bussey*, 108 Ill. 2d 286, 299 (1985). "A trial court abuses its discretion when it acts arbitrarily, without conscientious judgment, or, in view of all of the circumstances, exceeds the bounds of reason and ignores recognized principles of law, resulting in substantial injustice." *In re Marriage of Bradley*, 2011 IL App (4th) 110392, ¶ 26. For the following reasons, we find no abuse of discretion and affirm the trial court's judgment.

¶ 38      Although attorney fees are generally the responsibility of the party who incurred the fees (see *In re Marriage of Cantrell*, 314 Ill. App. 3d 623, 630 (2000)), section 508(a) of the Marriage Act permits a trial court to order a party to contribute to the other party's attorney fees in light of the parties' respective financial situations. See 750 ILCS 5/508(a) (West 2010). Section 508(a) states, in pertinent part:

> "The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount of his own or the other party's costs and attorney's fees. *** At the conclusion of any pre-judgment dissolution proceeding under this subsection, contribution to attorney's fees and costs may be awarded from the opposing party *in accordance with subjection (j) of Section 503* and in any other proceeding under this subsection." (Emphasis added.) *Id.*

¶ 39      Therese sought contribution to attorney fees for the prejudgment dissolution proceedings. Per the statute, attorney fees will be awarded, if at all, in accordance with section 503(j). Section 503(j) states, in pertinent part:

> "[A] party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided, in accordance with the following provisions:
>
>     ***
>
>     (2) Any award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j) (West 2010).

¶ 40      Here, maintenance was awarded and therefore the criteria from both sections 503 and 504 apply. Section 503(d) provides the criteria for division of marital property, which are, generally: (1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or nonmarital property; (2) dissipation of the property; (3) the value of the property of each spouse; (4) marriage duration; (5) the relevant economic circumstances of each spouse; (6) obligations from prior marriages; (7) antenuptial agreements; (8) the age, health, occupation, amount and sources of income, employability, job skills, liabilities, and needs of the parties; (9) custodial provisions for any children; (10) whether apportionment is in lieu of or in addition to maintenance; (11) reasonable

opportunity for future earning or income; and (12) tax consequences. 750 ILCS 5/503(d) (West 2010).

¶ 41 Section 504(a) also lists 12 factors, although some are the same as those in section 503(j). The criteria in section 504(a) of notable difference from section 503(d) are: (1) any impairment of present and future earning capacity due to devoting time to domestic duties or having forgone education, training, employment, or career opportunities due to marriage; (2) the time necessary to acquire appropriate education, training, or employment; (3) the standard of living established in the marriage; (4) contributions and services to the education, training, career, or career potential of the other spouse; and (5) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2010). Together, sections 504(a) and 503(d) provide the framework to determine whether the relative financial situations of the parties warrant a contribution to the attorney fees of one party.

¶ 42 Jon's first argument is that the trial court erred by setting Jon's net income too high, at approximately $12,000 per month.[4] The trial court admitted that it "had a difficult time determining [Jon's] monthly net income for several reasons," and it determined that his net monthly income was "approximately" $12,000. One reason the trial court had difficulty was that it found Jon's testimony to lack credibility, and we accord the trial court great deference in assessing credibility. See *In re Marriage of McHenry*, 292 Ill. App. 3d 634, 641 (1997) ("It is well established that determinations by the trier of fact as to the credibility of parties are given great deference.").

¶ 43 The record supports the trial court's determination. Twice Jon listed his monthly income on finance applications at $13,500, yet he testified that he never made more than $10,000 per month. Of particular note, Jon admitted that he handles significant amounts of cash for Spirit of America, Inc., and, when asked how much, answered "it varies." Jon is the sole secretary for Spirit of America, Inc., in which he has a 25% ownership interest. He counts the cash, and he admitted to receiving "gifts" from his mother of $50,000 per year for the five years before trial. Such "gifts" included paying for his health insurance. Furthermore, the court found Jon's federal tax returns to be inconsistent, both internally and with each other.

¶ 44 The thrust of Jon's argument is that the trial court lacked solid evidence that his gross monthly income was over $13,500, while other evidence supported less than $13,500. The "other evidence" was Jon's testimony that he made $10,000 per month in gross. On the other hand, there was testimony from Therese that Jon brought home $3,500 to $4,000 a week in cash. Given that the rest of the record does not make Jon's net income any more clear or precise, we agree that the trial court did the best it could in determining Jon's net income.

---

[4]The trial court did not state the amount of gross income it began with. However, it did adopt the $12,000 net figure that Therese proposed in her closing argument, which started with $14,500 gross and subtracted taxes and social security. Jon's argument regarding net income is repeated when Jon contends that the court erred by setting child support too high. We note that "net income" for purposes of child support is a term defined by section 505(a)(3) of the Marriage Act and that from the record it appears that the trial court determined net income pursuant to the section 505(a)(3) definition. Therefore, our analysis of net income here applies equally to our analysis of child support, *infra*.

There is at least as much evidence to support $12,000 net income as $10,000 gross. There is also ample evidence to doubt the credibility of Jon's testimony, including his position with Spirit of America, Inc., as the handler of all its cash, his ease of access to its funds, his equivocation as to the business's earnings, and his own financial applications that contradict his testimony as to his income. Furthermore, the trial court's determination of net income here was used for purposes of determining child support, and " '[i]ncome' for tax purposes is not synonymous with 'income' for determining child support." *In re Marriage of Bradley*, 2011 IL App (4th) 110392, ¶ 44. Thus, any "gifts" that Jon received, even if they were not reportable taxable income, would be income he could use to help support the children–one of the reasons why child support net income differs from taxable income. See *id.* For all these reasons, the trial court did not abuse its discretion in setting Jon's net income at $12,000 per month. *Cf. In re Marriage of Miller*, 231 Ill. App. 3d 480, 483 (1992) (finding no abuse of discretion in failing to consider unreported cash income in determining net income when there was conflicting testimony as to whether it was ever received). We note, however, that under the statutory guidelines Jon's income is only one factor to consider in whether to order contribution to attorney fees. See 750 ILCS 5/503(d), 504(a) (West 2010).

¶ 45    Jon's second argument is that, even at the income level determined by the trial court, the trial court abused its discretion in ordering him to contribute to Therese's attorney fees, because Therese was in a better financial situation than he–or at least their financial situations were substantially similar–and Therese did not show an inability to pay her own fees.

¶ 46    Jon relies on *In re Marriage of Schinelli*, 406 Ill. App. 3d 991 (2011), to establish that the parties' respective financial situations demonstrate that the trial court abused its discretion in this case. *Schinelli* involved an appeal of, *inter alia*, a $15,000 award for contribution to attorney fees. *Id.* at 995. The *Schinelli* court noted that the respondent made approximately $200,000 per year, whereas the petitioner made approximately $30,000. *Id.* The trial court attempted to rectify this difference by awarding the petitioner maintenance of approximately $80,000 per year ($6,692 to be paid monthly). *Id.* The *Schinelli* court reasoned that when maintenance was factored in–by subtracting $80,000 from the respondent's yearly income and adding $80,000 to the petitioner's yearly income–the parties stood in substantially similar financial situations, *i.e.*, $120,000 per year compared to $110,000 per year. *Id.* at 996. Furthermore, the *Schinelli* court found that the petitioner had not provided evidence of her inability to pay attorney fees. *Id.* For these reasons, the *Schinelli* court found that the trial court abused its discretion in awarding the petitioner contribution to attorney fees. *Id.*

¶ 47    Jon urges this court not only to adopt the *Schinelli* formulaic comparison of the parties' financial situations but to expand it by including child support in our calculation.[5] We have

_____

[5]Jon proposes that we compare his and Therese's financial situations by taking his net income less maintenance and child support ($12,000 minus $2,500 minus $4,800) and comparing that against Therese's net income plus maintenance and child support (approximately $800 plus $2,500 plus $4,800). Such proposed calculations yield $4,700 per month for Jon before other expenses and $8,100 for Therese.

doubts as to whether including child support in the *Schinelli* calculus would be proper even if we were to find the *Schinelli* analysis applicable here. See *In re Keon C.*, 344 Ill. App. 3d 1137, 1147 (2003) (child support payments did not factor into whether petitioner could pay her own attorney fees; those monies were for child support and not for her personal use or payment of attorney fees). Regardless of the propriety of including child support in the *Schinelli* calculus, however, Jon's reliance on *Schinelli* is misplaced. As Therese argues, the Marriage Act provides the proper analysis to determine whether contribution to attorney fees is proper. Under section 508(a) of the Marriage Act, the court is to consider the financial resources of the parties, and such consideration is to be done in accordance with section 503(j). See 750 ILCS 5/508(a) (West 2010). Section 503(j) directs consideration of the factors listed under section 503(d) and, if maintenance was awarded, the factors under section 504(a). See 750 ILCS 5/503(j) (West 2010). While the amount and sources of income are indeed factors to be considered, so too are all the relevant economic circumstances of the parties at the time of the division of the property. See 750 ILCS 5/503(d)(5), (d)(8) (West 2010). Between sections 503(d) and 504(a) there are 24 factors to consider, albeit some of the factors are duplicative.

¶ 48    In *Schinelli*, the salient criteria for the analysis were the net incomes adjusted by the maintenance award. But see *In re Marriage of Minear*, 181 Ill. 2d 552, 563 (1998) (affirming trial court's award of attorney fees that was proportional to income *before* accounting for maintenance payments). Those were the only material facts the *Schinelli* court worked with to find that the trial court abused its discretion. In this case, the trial court considered additional factors. In making its initial determination of maintenance, the trial court considered "all criteria set forth in Section 504"–factors also to be considered for an award of attorney fees–and was persuaded by "the disparity in income between the parties, both currently and potentially; the length of the [m]arriage; and [Therese's] health." A critical factor for the trial court was Therese's health, which is a listed factor for attorney fees under section 503(d)(8)–the very same section that lists "amount and sources of income" as a factor. 750 ILCS 5/503(d)(8) (West 2010). The trial court found that Therese is bipolar, suffers from depression, and is in remission from cancer. She also had surgery for a secondary cancer shortly before trial, and she testified that her health insurance cost nearly $685 per month. The trial court found that Therese worked 20 to 25 hours a week at $10 per hour, was not self-supporting, had sufficiently searched for full-time employment, and had less promising financial prospects than Jon. Additionally, the trial court could have considered that Therese gave up full-time employment years ago to care for the children, a factor to consider under section 504(a)(1).

¶ 49    Section 508(a) provides for an *ad hoc* approach to determining a contribution to attorney fees, so that a court can better equalize the relative positions of the parties before it and diminish the litigation advantage one spouse might have over another due to their respective financial situations. See *In re Marriage of Pagano*, 154 Ill. 2d 174, 183 (1992). The *Schinelli* court cited general guiding principles: "[t]he propriety of an award of attorney fees is dependent upon a showing by the party seeking them of an inability to pay and the ability of the other spouse to do so," and an award of attorney fees will be reversed "when the financial circumstances of both parties are substantially similar and the party seeking fees has

not shown an inability to pay." *Schinelli*, 406 Ill. App. 3d at 995. These rules are not incorrect; they are, however, incomplete when applied to the facts of this case. The language cited in the analysis of the contribution award in *Schinelli*, as well as other recent marriage dissolution cases, was repeated from cases that predate the current, amended version of section 508(a). See *In re Marriage of Haken*, 394 Ill. App. 3d 155, 162 (2009) (providing examples from the First, Second, Fourth, and Fifth Districts of our Appellate Court); see also *In re Marriage of Roth*, 99 Ill. App. 3d 679, 686 (1981) (preamendment case cited by *Schinelli* for rule that court abuses its discretion in awarding attorney fees when parties are in substantially similar financial situations). Although neither the phrase "inability to pay" nor a specific test for substantially similar financial situations appears in the statute, the factors under sections 503(d) and 504(a) are there to compare the relative financial standings of the parties. *Haken*, 394 Ill. App. 3d at 162. The statutory factors are the means by which a trial court can determine whether a spouse has an inability to pay or whether the parties' financial situations are so similar that a contribution to attorney fees would be improper. Furthermore, the conclusory phrase "inability to pay" was not meant to be interpreted definitively, whereas the plain language of the statutory factors provides a framework within which to compare the relative means of parties to pay their attorney fees. See *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005) ("Financial inability exists where requiring payment of fees would strip that party of her means of support or undermine financial stability."); *In re Marriage of Pond*, 379 Ill. App. 3d 982, 987 (2008) ("Inability to pay does not require a showing of destitution ***. *** [T]he court should consider the allocation of assets and liabilities, maintenance, and the relative earning abilities of the parties."); *In re Marriage of Carr*, 221 Ill. App. 3d 609, 612 (1991) (" '[I]nability to pay' must be determined relative to the party's standard of living, employment abilities, allocated capital assets, existing indebtedness, and income available from investments and maintenance.").

¶ 50   Accordingly, we reject Jon's argument that we are to apply a simple formula to compare relative financial situations. The trial court properly considered evidence on various statutory factors as presented by the parties, and it was persuaded by factors such as Therese's health and earning potential relative to Jon's. Therefore, the trial court did not abuse its discretion in awarding Therese $43,180.50 for attorney fees.

¶ 51                    B. Deviation From Child Support Guidelines

¶ 52   Jon also argues that the trial court abused its discretion by ordering him to pay $4,800 per month in child support. Jon requests that his monthly payment be reduced to $4,000. His argument is twofold: (1) the trial court erred in setting his net income at $12,000 per month, and (2) the trial court should have deviated from the statutory child support guidelines, because the children spend a significant amount of time with him. For the reasons set forth in our analysis of attorney fees above, the trial court did not err in finding that Jon's net monthly income was $12,000. Therefore we address only the remaining argument, that the trial court should have deviated from the statutory child support guidelines.

¶ 53   We review an award of child support for an abuse of discretion. *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 37. The statutory basis for child support is found in

section 505(a) of the Marriage Act. 750 ILCS 5/505(a) (West 2010). The statutory guidelines provide that the amount of a child support award be based on the number of children and the supporting party's net income; when there are four children, as there are here, the guideline award is 40% of the party's net income. See 750 ILCS 5/508(a)(1) (West 2010). If the trial court deviates from the guideline amount, it must consider at least one of five factors under section 505(a)(2), state the amount that would have been required under the guidelines, and state its reasons for deviating from the guidelines. 750 ILCS 5/508(a)(2) (West 2010); see *Berberet*, 2012 IL App (4th) 110749, ¶ 37.

¶ 54    "Child support is an obligation the parents owe for the benefit of the child ***. Even in cases involving joint custody, when a primary physical custodian has been designated, the trial court has an obligation to award child support or explain its downward deviation from the statutory guidelines." *In re Marriage of Deem*, 328 Ill. App. 3d 453, 458 (2002). Here, the trial court ordered Jon to pay the guideline amount of 40% of his $12,000 net income, that is, $4,800 per month. Jon references two of the five factors that a court may consider that would permit a deviation from the statutory guidelines: the financial resources and needs of the child (750 ILCS 5/505(a)(2)(a) (West 2010)), and the financial resources and needs of the noncustodial parent (750 ILCS 5/505(a)(2)(e) (West 2010)). However, he does not explain how these factors apply. Instead, Jon argues that because he spends a significant amount of time with the children per the joint parenting agreement–at least portions of 216 days in a given year–he would be spending a significant amount of money to support the children beyond his child support payments, whereas Therese would be spending less money.

¶ 55    Instructive here is *In re Marriage of Demattia*, 302 Ill. App. 3d 390 (1999). In *Demattia*, the father argued that the trial court abused its discretion by not deviating downward from the child support guideline amount. *Id.* at 394. He argued that he provided primary care for the children 10 out of every 14 days, for at least 8 hours a day, and saved the mother the expense of day care. *Id.* The *Demattia* court was unpersuaded. *Id.* at 395. Although the court limited its decision to the facts in its case, it held that there should not be an automatic reduction in child support because the father spends extended time with his children, who reside permanently with the mother. *Id.* "Caring for one's own children is not day care nor is it a chore for which to be compensated." *Id.*

¶ 56    The relevant facts in *Demattia* included: relatively equal incomes of the father and mother; the mother's assumption of the mortgage on the marital residence, for which she compensated the father; and the mother's responsibility for maintaining the children's standard of living. *Id.* at 394. In our case, the trial court found that Jon had relatively higher income and earning potential than Therese. Therese was awarded the marital residence until the sale of the property, from which she received 65% of the net proceeds, and she provides for the physical residency of the four children. Similar to the situation in *Demattia*, the joint parenting agreement provides extended parenting time for Jon.

¶ 57    Like the court in *Demattia*, we are unpersuaded that extended time spent with one's children requires a deviation from the statutory guidelines for child support. It is unclear how extended time spent with one's children affects the financial resources and needs of the children, or the financial resources and needs of the noncustodial parent, in a way that warrants deviation from the child support guidelines. Therese is the physical custodian of all

-13-

four children; the needs of the children remain the same; and, per *Demattia*, spending time with one's children is not a chore that requires compensation but rather it is just that: spending time with one's children. Furthermore, the section 505(a)(2) factors are to be considered in light of the best interests of the children. Jon presented no evidence as to how a deviation downward from the guideline amount of child support would comport with the best interests of the children.

¶ 58    The trial court followed the statutory guidelines for child support, and Jon presented no evidence that would support a deviation from the guidelines, much less an abuse of discretion for not deviating from the guidelines. Therefore, we affirm the trial court's award of child support.

¶ 59                              III. CONCLUSION

¶ 60    The trial court did not abuse its discretion in awarding Therese contribution to attorney fees or in setting the child support award at $4,800 per month. The trial court considered relevant statutory factors that supported a contribution to attorney fees, based on the parties' relative financial circumstances. The trial court was not required to follow a rigid formula in comparing the parties' financial situations but, rather, properly considered various relevant facts on the record. The trial court also followed the statutory guidelines in awarding child support, and the record does not show that the trial court abused its discretion by not deviating from the guideline amount. Accordingly, we affirm the judgment of the Du Page County circuit court.

¶ 61    Affirmed.